STATE OF VERMONT

SUPERIOR COURT                         ENVIRONMENTAL DIVISION

Vermont Unit                              Docket No. 99-7-13 Vtec

|  |  |
|---|---|
| Creative Spirit Conditional Use & Site Plan Approval (After Remand) |  |

## Decision on the Merits

Applicant Sheila Bedi seeks conditional use and site plan approval to convert an existing single-family home, located at 154 West Fairlee Road in the Town of Thetford, Vermont, into a child daycare facility ("the Project"). The pending application has a somewhat long and tortured history that warrants some explanation. We do so at the introduction of this Decision on the Merits because, while the procedural history has several chapters, the substantive part of our Merits Decision only addresses the pending application based upon the evidence introduced and admitted at trial.

## Procedural History

Ms. Bedi first submitted a conditional use and site plan approval application on August 23, 2012. The Town of Thetford Development Review Board ("the DRB") held an initial hearing on the application on September 25, 2012. The hearing was continued to October 9, 2012 and then again to October 23, 2012. The DRB then issued a written decision granting Ms. Bedi's application with conditions on November 27, 2012. A number of concerned neighbors timely appealed that decision to this Court. This Court assigned Docket No. 168-12-12 Vtec to that appeal.

At the request of the Town of Thetford ("Town") and with the consent of Ms. Bedi and the appealing neighbors, the Court remanded that application to the DRB to make further findings of fact and conclusions of law that were not present in the November 27, 2012 decision. In granting the motion to remand, the Court dismissed, without prejudice, that first appeal.

The DRB approved her second application, with conditions, in a decision dated July 2, 2013. Neighbors Ridge Satterthwaite, Sally Gage, Cathy Estes, Peter Estes, Deborah McKee, Glenn McKee, Christine Kogel, Cleopatra Mathis, Philip Banios, Helen Drew, Jon Kryander, Cathy Roberts, and Joe Roberts ("Appellants") timely appealed that second DRB approval to this Court. Marjorie Powers (a neighbor) and Fred and Bethany Budzyn (the current owners of the land on which Applicant plans to develop her daycare facility) appeared as Interested Persons. Ms. Bedi and the Town are represented by Brian P. Monaghan, Esq. Appellants are represented by Nathan H. Stearns, Esq., who was assisted at trial by attorney Daniel C. Hershenson, Esq. The Interested Persons are self-represented.

Appellants filed a twenty-three-question Statement of Questions, presenting issues generally related to conditional use and site plan approval under the Town of Thetford, Vermont Zoning Bylaw ("Bylaws"), including issues of parking, traffic and circulation, lighting, landscaping, grading and drainage, impacts on the character of the area, noise, visual impacts, and state-issued wastewater and water-supply permits. Ms. Bedi and the Town moved for summary judgment in their favor on all of Appellants' questions. In response, Appellants agreed to withdraw three of their twenty-three questions, but opposed the pending summary judgment motion on the remaining questions. The Court thereafter dismissed Questions 2, 21, and 22 (the questions Appellants agreed to withdraw), determined that summary judgment should be entered in Applicant's favor as to Question 1, and that the applicable law required that Question 23 be dismissed. In re Creative Spirit Conditional Use & Site Plan Application, No. 99-7-13 Vtec, slip op. at 4–6 (Vt. Super. Ct. Envtl. Div. Sept. 26, 2014) (Durkin, J.). None of the testimony or arguments at trial caused the Court to reconsider these pre-trial determinations. We therefore incorporate by this reference those determinations into our Merits Decision, thereby rendering them final.

The Court determined that the remaining legal issues (addressed in Appellants' Questions 3 through 20, inclusive) could not be resolved on summary judgment, since Appellants had presented a basis for disputing the facts material to each of those legal issues. Id. at 6–7. The Court determined that a trial was necessary in order to resolve these disputes over material facts. Id.

The matter was initially set for a one-day trial on October 9, 2014. When it became apparent that the trial could not be completed that day, the trial was continued on the following day (Friday, October 10, 2014). When it then became apparent that a third day was needed to complete the trial, the Court searched for the next available day, which was November 5, 2014. The trial was completed that day. Prior to the first day of trial (October 9, 2014), the Court conducted a site visit with the parties and their respective attorneys and experts. The site visit provided helpful context for the evidence that was presented at trial.

Once the trial was completed, the parties requested and the Court allowed additional time for the filing of proposed findings of fact and conclusions of law and responses thereto. Those filings were completed and this matter came under advisement on December 31, 2014. Due to other commitments and administrative matters, the Court delayed the research, deliberation, and drafting required to complete this Merits Decision, for which the Court offers its apologies to the parties and their counsel.

Based upon the evidence admitted at trial, including that which was put into context by the site visit that the Court conducted with the parties, the Court renders the following Findings of Fact, Conclusions or Law, and Judgment Order that accompanies this Merits Decision.

**Findings of Fact**

I.      **General Background**

1.      Sheila Bedi ("Applicant") currently operates a daycare facility that she began about fourteen years ago. She operates her current facility out of an old school building in the Town of Fairlee in an area known as the West Fairlee Village. The Town of Fairlee adjoins the Town of Thetford.

2.      Applicant's current facility has twenty-five children enrolled in her daycare program. She employs seven people not including herself, although she does work regularly at the facility.

3.      Parents generally drop off their children at Ms. Bedi's current daycare between 7:00 a.m. and 9:00 a.m.; most daycare enrollees are picked up beginning at 3:00 p.m.

3

4. Applicant also offers after-school care for enrolled children between the hours of 3:30 p.m. to 6:00 p.m. Although a specific percentage was not provided, not all enrolled children continue at Applicant's center for after-school hours.

5. During her fourteen years of operation, Applicant has not received a single complaint about noise or other activities that bothered the neighbors at her current daycare center.

6. The Court found Ms. Bedi's testimony credible, particularly since her current daycare center has received a "Five-Star Certification" from the State of Vermont. This certification includes a review of the quality of care at a daycare center, including evaluations of both the inside and outside portions of the facility. Five stars is the highest rating given for this type of certification.

## II.    Subject Property and Proposed Improvements

7. Applicant submitted an application for conditional use and site plan approvals to renovate an existing single-family residence and attached garage and establish a child daycare facility at 154 West Fairlee Road in the Town of Thetford, Vermont ("the Subject Property").

8. While her current daycare center has been successful, Applicant concluded that she would prefer to develop a slightly larger facility, closer to area schools; she intends to operate her proposed facility in a fashion similar to her current facility. After a search for alternate sites, she concluded that the already-existing building on the Subject Property would be ideal, since it is located between two school districts along existing bus routes and is of a suitable size.

9. The Subject Property is near Lake Fairlee, about two miles from Applicant's current daycare facility.

10. The Subject Property is bounded on the western side by Field Point Road, which is a private roadway that serves four residential properties, and on the southern/southwestern side by West Fairlee Road, which is a town highway. To the southeast, east, and northeast are residential properties. A copy of a portion of the Town of Thetford Grand List tax map, depicting the Property and surrounding properties, was admitted at trial as Appellants' Exhibit 2.

11. The Subject Property contains 1.84± acres.

12. The floor area of the building, including the attached two-car garage, is approximately 2,755 square feet.

13. The use as proposed would serve no more than thirty-eight children and would employ no more than nine staff members at any one time at the facility. In total, Applicant proposes to employ seven full-time and three part-time staff members.

14. Applicant proposes to make extensive renovations to the interior of the building on the Subject Property. However, no renovations to the exterior of the building or expansion of its footprint are proposed.

15. The proposed interior renovations would include finishing the garage as a classroom area, kitchenette, and bathroom while using the interior of the residence as a preschool classroom, a room for infants with a kitchen area, and a dining room and full kitchen.

16. Applicant provided a detailed, credible written explanation of her proposed project and its impacts to the surrounding area, entitled "Creative Spirits Children's Center," a copy of which was admitted at trial as Exhibit C.

17. Applicant also proposes to make the following improvements to the land surrounding the renovated building:

   a. A new parking area, gravel-surfaced, will be developed on the area now used as a lawn on the westerly side of the building. The parking area will have nineteen parking spaces, all of which will be 10 feet wide by 20 feet deep, except that one space is an ADA-compliant parking space, which has additional space around it.

   b. The parking area will be located about 6½ feet from the property boundary with Field Point Road. The parking area will be 60 feet wide and 118 feet deep.

   c. The parking area will be shielded from Field Point Road by some existing trees and by additional cedar trees that Applicant proposes to plant relatively tightly (eight feet apart, measured on center).

   d. The parking area as currently proposed will allow parents transporting their children to pull in to the parking area, deliver their children to the daycare, then turn their vehicles around to return to West Fairlee Road.

   e. The Property currently has an ingress/egress point along Field Point Road. Applicant will block off this access point with new cedar tree plantings so as to limit vehicular access to one point: the driveway on West Fairlee Road.

   f. A four-foot-tall wooden stockade fence will also be installed in front of the parking area, for screening purposes. This fence will be stained a color similar to

5

the existing house and this new fence will run from the edge of the existing driveway to the westerly property boundary line.

g. The existing driveway is gravel-surfaced and 24 feet wide with a 30-foot-radius curve-out on each side at the street edge; it is generally flat and is less than 100 feet long. Where the driveway intersects with West Fairlee Road, the paved driveway apron will be expanded so as to accommodate vehicles turning into and out of the driveway, as recommended by the Vermont Agency of Transportation ("VTrans").

h. The Town of Thetford Public Works Director has reviewed and approved the Project's proposed driveway and curb cut improvements. He determined that the proposed driveway conformed to all width, horizontal, vertical, and other geometric characteristics recommended by the VTrans B-71 Standards.

i. Children will be supervised when they are allowed to play outside in the rear lawn area of the Property. So as to provide protection and screening, the rear lawn area will be enclosed using two types of fencing: stockade fencing on the front portions and a "safety fence" made of metal and dark fabric for the sides and rear. The stockade fence will be wooden and will be stained a color similar to the existing building. Both fences will be four feet in height. Applicant has used fencing at her current facility that is similar to both types of proposed fencing. There have not been any complaints concerning this fencing, nor injuries to any children attributed to the fencing in the many years that fencing has been in use at her current facility. No trees will be removed to accommodate the proposed play area or fencing.

j. Applicant proposes to retain existing trees and other plantings, to plant four-foot-tall cedar trees every 30 feet along the front portion of the stockade fence, and plant a number of additional four-foot-tall cedars between Field Point Road and the parking area. These existing and proposed plantings, as well as the proposed fencing, will provide some visual and audio buffers from the activities of the daycare center.

k. The existing residence on the Subject Property has some exterior lighting, particularly at some of the exterior doors. That lighting will remain, and additional lighting will be installed on the front of the garage area and beside two additional side doorways, as depicted on Exhibit C, page 17. All new lighting fixtures will be downcast, mounted no more than eight feet above the ground, activated by motion sensors, and shielded to block direct views of the lighting source.

l. There currently is a fenced-in garden near the rear of the Subject Property. Applicant intends to maintain and improve upon that garden and to incorporate it into the supervised activities.

18.     Applicant will not use any vehicles as part of her business.  Employees traveling to and from work will use their own vehicles.

19.     If Applicant's proposed facility reaches its planned capacity of thirty-eight children, the Project is estimated to generate a maximum of thirty additional round trips each morning as parents drop off one or more children and a maximum of thirty round trips each late afternoon or evening as parents pick up one or more children.  It is possible that the Project will not add more than a few new round trips each morning and evening on West Fairlee Road, since area families already travel these roads to bring their children to and from other area schools and daycare facilities.  Thus, the net increase of traffic on West Fairlee Road will be minimal.

20.     Employees of the proposed daycare facility will cause eight round trips to and from the facility each day.  Given that the daycare facility will replace a residential use at the existing building, and that a residential use usually translates to several round trips per day, the round trips of employees will not equate to more than a few additional round trips over the current use.

21.     The proposed daycare will operate Monday through Friday each week during the hours of 6:30 a.m. to 6:30 p.m.  There are no proposed plans to operate during the evening hours or on the weekends.

22.     Appellants presented several photographs of the areas adjacent to the Subject Property that provided helpful context for that portion of this neighborhood.  See (Appellants' Exs. 4(a)–(h)).  As revealed by these photos, most of the areas near the property boundaries are wooded or covered with brush.

III.     **Surrounding Neighborhood, Development & Uses**

23.     The Town of Thetford is located in the Upper Valley region of Vermont, north of White River Junction.  It is bisected by Interstate 91, with an eastern boundary along the Connecticut River.  The Town is comprised of six villages: East Thetford, North Thetford, Thetford Hill, Thetford Center, Rice Mills and Post Mills.  The Town's northwestern border is adjacent to the West Fairlee Village area of the adjoining Town of Fairlee.

24.     West Fairlee Road helps define the immediate neighborhood surrounding the Subject Property in that it serves as a travel lane for residents and visitors travelling from West Fairlee

and areas to the immediate west and northwest, Lake Fairlee to the immediate east, and two well-travelled highways: Vermont Route 113 to the west and Vermont Route 244, which is to the east and travels around the border of Lake Fairlee. West Fairlee Road serves as a convenient connector between these two state highways

25. The Property is located in or near the Post Mills Village section of Town, along the Town's northern border with the abutting Town of Fairlee. The Subject Property is located in the Village Residential Zoning District ("VR District"), as noted on the Zoning District map included as the last page of the Bylaws, a copy of which was admitted at trial as Exhibit G.

26. The Town contains several separate areas that are designated as VR Districts. The VR District that contains the Subject Property includes all properties within the immediate vicinity of the Property.

27. The area surrounding the Subject Property is mostly developed with single-family homes, some of which contain a home-based business, including a financial advisor who sometimes conducts office visits with clients in his home and a guitar maker who sometimes receives customers in his home to sell his guitars or give lessons on making guitars.

28. About 320 feet east of the Subject Property, also on West Fairlee Road, an electrician operates a contractor's yard for his business. There have been as many as nineteen commercial trucks and other vehicles that operate out of this property.

29. The westerly shores of Lake Fairlee are about 1,000 feet from the Subject Property. This lake has several public and private beaches; noises from those beaches can be heard at properties near the proposed Project.

30. One or more seasonal children's camps are located along the western shores of Lake Fairlee, just north of where West Fairlee Road joins Vermont Route 244, near the Lake's western shore. Another seasonal children's camp is located on the opposite side of the Lake. Activities at these children's camps, including a public address system used at one or more of these summer children's camps, can be heard at properties near the proposed Project.

31. One or more churches are located within the broader neighborhood of the Subject Property. At least one of those churches has bells in its steeple that are regularly used to announce the top of the hour (with the bells ringing to denote the number of the hour) and

8

once during the half hour. The church bells can be regularly heard at the Subject Property and the surrounding properties.

32. Post Mills Airport is located off of Route 244, about a quarter of a mile away from the Subject Property, as the crow flies. This is a private airport that sees most or all of its activity during the non-winter months. Up to eighty flights per week operate out of this airport, some of which pass over the Subject Property and neighboring properties. Airplanes can be heard taking off and flying over the immediate area surrounding the Subject Property.

33. In addition to the noises that are apparent at and near the Subject Property from the airport, churches, contractor's yard, and children's camp, all described above, the area surrounding the Subject Property experiences the noises customarily heard in rural residential neighborhoods, such as children playing, regular traffic noises, dogs barking, wild animals howling, lawn mowers and other power tools operating, and noises from various other human activities.

34. Many of these existing activities cause noises that may be heard or recorded at nearby property boundaries at a level that exceeds the applicable noise limits referenced in the Town of Thetford, Vermont Zoning Bylaw ("Bylaws"). See Bylaws § 6.05(E)(9)(a) (limiting noise to 60 dBA at property boundaries within the VR and Rural Residential Zoning Districts during the hours of 7:30 a.m. to 7:30 p.m.). Some of those background noises have been recorded at 79 dBA at the nearest property boundary line to the Subject Property.

35. West Fairlee Road experiences regular traffic, both from area residents and from travelers passing from west to east. Logging trucks also use West Fairlee Road on an average of one to two trips per day. Nonetheless, the area roadways are relatively safe.

36. While some evidence was presented of individual drivers exceeding the posted speed limit of 35 miles per hour on West Fairlee Road, there was no accident reported that involved someone backing out of or turning into any area driveway. In fact, there was only one accident reported in the last ten years on West Fairlee Road: as Appellant Mr. Satterthwaite credibly phrased it, it involved non-neighborhood "kids drinking [and] travelling very fast."

9

**IV.** **Impacts of proposed Development on Surrounding Area**

37.     Many of the neighboring Appellants expressed concerns about possibly hearing the children playing outside at the daycare facility.  In particular, Ms. Estes advised that "the sound of children can be annoying to me, even if I am [with the children]."

38.     Applicant's expert credibly testified about the estimated noise levels of children during outside play.  His calculations were especially credible because they were based, in part, on measurements taken at Applicant's existing daycare center.

39.     The credible evidence revealed that the noises generated by children playing outside at Applicants' current daycare center registered as high as 71 dBA at 30 feet from the center of the play group.  In order to reduce the level of noises from such a play group to 60 dBA, the center of the children playing would need to move at least 107 feet farther from the measuring point.

40.     In addition, the level of noise from any source may be reduced when objects are placed between a noise source and the place where the noise level is being perceived.  For this reason, the building, fencing, trees and other plantings proposed for the Subject Property will further reduce the level of noises realized at the property boundaries.

41.     The estimated noises from children playing are unlikely to ever exceed the levels of existing background noises at the Subject Property.  Due to the nature of noise, this means that noises from children playing outside at the Subject Property are likely to be frequently drowned out by the existing noises experienced in this area.

42.     Both the existing and proposed lighting for the Subject Property is consistent with the existing lighting in the surrounding area.  None of the existing or proposed lighting will result in a direct view of a fixture's light source from any area other than on the Subject Property, directly underneath the light fixture.

43.     The Subject Property is located on a fairly straight and flat stretch of West Fairlee Road.  In either direction, the road gently rises with the terrain, at which point the sight of oncoming traffic becomes limited.  The road is aligned in such a way that the sight distance from the driveway, measured fifteen feet back from the edge of the roadway and at a height of a driver

(i.e., about three feet above the driveway surface) is 312 feet when the driver is looking towards the east and 353 feet when the driver is looking towards the west.

44.     The sight distances from the Project driveway on West Fairlee Road in both directions exceed the minimum stopping sight distances recommended by national highway safety organizations; therefore, traffic arriving from either direction can see for a sufficient distance to safely stop for vehicles exiting or turning into the proposed driveway.

45.     Several of the neighboring Appellants expressed concern that, if the project was allowed, it would introduce "large commercial activities" to the area.  No Appellant described the proposed project as a large commercial operation; most or all of Appellants who testified admitted that area properties already include small commercial and home-based businesses.

## Discussion

Applicant seeks to convert a single-family home to a daycare facility in the VR District in the Town of Thetford.  Under the Town's Bylaws, a daycare facility is a conditional use in the VR District.  See Bylaws tbl. 2.1 (listing "community service" uses as conditional uses in the VR District); id. § 2.04(B) (defining "community service" uses to include day care facilities).  Under the Bylaws, any development constituting a conditional use requires both conditional use and site plan approval from the DRB.  Id. § 7.03(2), 7.03(2)(b).  Appellants challenge Applicant's eligibility for conditional use or site plan approval under the Bylaws, and they have raised twenty-three questions in this appeal, only eighteen of which remain after this Court's pre-trial decision in In re Creative Spirit Conditional Use & Site Plan Application (After Remand), No. 99-7-13 Vtec, slip op. at 4–6 (Vt. Super. Ct. Envtl. Div. Sept. 26, 2014) (Durkin, J.).

Our review of the applicable site plan review and conditional use standards is limited to those that are preserved for our review by Appellant's Statement of Questions.  V.R.E.C.P. 5(f).  If an appellant does not preserve a legal issue in her statement of questions, it cannot be considered by this Court.  Id.; see also 24 V.S.A. § 4472(d).  Since a number of Appellants' questions challenge the adequacy of the pending application and supporting materials, rather than the Project's conformance to the substantive site plan and conditional use standards, we address the former questions first.

11

**I.** **Sufficiency of Application and Supporting Materials (Questions 3–8, 13 and 19)**

In Questions 3 through 8, 13, and 19, Appellants essentially ask whether Applicant has presented sufficient information and supporting materials to meet the minimum thresholds required for site plan and conditional use review under Sections 6.05 and 6.06 of the Bylaws. Questions 3, 4, and 5 ask whether Applicant has submitted all materials required for site plan review under Subsection 6.05(C) of the Bylaws and whether her application can be granted if she has not. Questions 6 and 7 inquire about the adequacy of Applicant's traffic estimate and statement of compliance submitted under Subsections 6.05(C)(1)(i) and (j). Questions 8 and 13 ask the Court to require a visual impact study and a lighting plan under Subsections 6.05(C)(2)(c) and 6.05(E)(8)(a). Finally, Question 19 asks whether this Court should demand a detailed traffic study under the Bylaws' conditional use review provisions. See Bylaws § 6.06(D)(3). For the reasons stated below, we conclude that the testimony, materials, and other evidence presented at trial meet these minimum thresholds for a complete application under the Bylaws.

Appellants generally challenge the sufficiency of Applicant's materials (Questions 3 through 5) under Subsection 6.05(C) of the Bylaws. Part of the necessity for these questions comes from the simplicity of Applicant's initial application and presentation to the DRB, which were very sparse. However, as is often the case when a project raises concerns, Applicant employed an engineer and other experts who then revised the application materials after this Court remanded the pending application back to the DRB, and again prior to the merits hearing before this Court. Applicant's trial exhibits included a detailed site plan (Exhibit A), an extensive application and narrative about the planned project (Exhibit C), and detailed supporting exhibits (Exhibits B and J). In addition, Applicant's engineer, Richard F. Hamlin, P.E., provided credible testimony in response to each of Appellants' remaining Questions. These revised materials were more than adequate to satisfy the application requirements under Subsection 6.05.

Appellants, however, implicitly ask this Court to judge the adequacy of Applicant's application based on the materials she initially presented to the DRB, under a theory that this Court may not consider revised applications. We have held, and the Supreme Court has affirmed, that when a site plan or supporting materials are revised, including after a Project

12

application has been appealed to this Court, it may be appropriate for this Court to allow such revisions to be presented at trial.  In re Sisters & Brothers Inv. Grp., LLP, No. 106-5-06 Vtec (Vt. Envtl. Ct. June 27, 2007) (Durkin, J.), aff'd 2009 VT 58, ¶ 21, 186 Vt. 103.  Indeed, the Court may review revisions to site plan review so long as those revisions are not "truly substantial changes to the form or type of an application."  Id. ¶ 21.  This is particularly so when applicants have revised their proposals in response to specific concerns from opposing parties.  In re Lathrop Ltd. P'ship, 2015 VT 49, ¶100 (citing In re Chaves A250 Permit Reconsider, 2014 VT 5, ¶ 16, 195 Vt. 467).

As in Sisters & Brothers, the concerned Appellants here argued that because Applicant had added details to her proposed site plan and presented it to this Court without first presenting the revised site plan to the DRB, this Court should remand the application, again, to the DRB for its consideration of the revised site plan.  We decline to follow Appellants' recommendation.  We are unaware of any statute or procedural rule that requires a land use applicant to submit the exact same plans to this Court in the course of an appeal as were submitted to the appropriate municipal panel below.  To point out that the plans are "different" may be accurate, but avoids the true legal issue: does the site plan or application presented on appeal call for a materially different project or development proposal.  See Lathrop, 2015 VT 49 at ¶ 100.  In the case at bar, we see no material differences between the Project presented by Applicant's initial submissions to the DRB and the Exhibits presented at trial: each version of Applicant's plan calls for the transformation of a single-family residence to a daycare center, with no exterior building changes, a new parking area to the west, some additional building-mounted lights,[1] and fencing.  For the most part, Applicant's revisions merely added detail to her proposal.  To the extent her revisions changed the substance of her application, those substantive revisions were intended to address Appellants' specific concerns, and we are particularly willing to consider substantive application revisions that are made in

---

[1]  Appellants make note of fourteen additional lights in Applicant's initial site plan, including ten in the parking area.  Applicant's original plans may have called for that many additional lighting fixtures, but the final plans presented at trial called for only four more building-mounted lighting fixtures, all of the down-cast variety and activated by motion sensors.  See Exhibit C at 17–19.  This is not a case where a change in degree is a change in kind, and we are especially disinclined to find that this scaled-back lighting plan is a material change, since the changes were likely meant to address Appellants' concerns. See Lathrop, 2015 VT 49, ¶100.

response to specific objections. See Lathrop, 2015 VT 49, ¶ 100. We therefore conclude that this Court may consider the revised application and, for the reasons discussed below, we find that the revised application contains sufficient detail to satisfy all procedural application requirements in the Bylaws.

Turning to the adequacy of the specific materials Applicant presented at trial (Questions 6–8, 13, and 19), we find all of Applicant's submitted materials to be sufficient to satisfy the application completeness requirements under the standards in Sections 6.05 and 6.06 of the Bylaws.

By their Question 6, Appellants challenge the adequacy of Applicant's traffic estimates. Subsection 6.05(C)(1)(i) requires Applicants to submit an "estimate of traffic to be generated by the Project on a peak and daily basis, and the impact of such traffic on area roads." This provision, by our interpretation, requires an estimate of daily peak traffic to be generated and how that traffic may impact area roads. Applicant's engineer provided such testimony at trial.[2]

By their Question 7, Appellants ask whether a site plan applicant must submit "a written statement . . . demonstrating that the Project is in compliance with all applicable zoning district standards in accordance with Section 6.05(C)(1)(j)." (Appellants' Statement of Questions at 2, filed Aug. 9, 2013) ("SOQ"). We note that the Bylaw does not require that the statement be written. We can find no Bylaw provision that would allow us to read such an added provision in this Bylaw, and therefore choose not to do so. Applicant and her engineer did testify that this Project conformed to all applicable Bylaw provisions. Applicant's representations, and those of her engineer, therefore satisfy the procedural requirements of Section 6.05(C)(1)(j).

Appellants' Question 8 asks whether a "visual impact analysis" should be required under Section 6.05(C)(2)(c) of the Bylaws. Subsection 6.05(C)(2)(c) provides the DRB, or in the instance of an appeal, this Court, with the discretion to require a visual impact analysis. The Court need not demand such an analysis, since Applicant and her engineer voluntarily provided credible testimony and exhibits concerning the visual and other impacts that may be caused by

---

[2] Appellants' Question 6 suggests that Applicant must not only introduce a traffic estimate, but a "scientifically accurate estimate of traffic." This requirement is not actually in the Bylaws, however, and, in any event, we are convinced that Applicant's engineer provided scientifically accurate estimates of the Project's estimated traffic and its impact; the impacts of the estimated Project traffic are discussed in more detail below in Part II.

the Project.  We therefore decline to require Applicant to present an additional visual impact analysis.

By their Question 13, Appellants suggest that an additional "lighting plan prepared by a qualified engineer or lighting expert is required for this Project pursuant to Section 6.05(E)(8)(a) in that the Project has the potential for significant off-site impact due to the number, location, and intensity of [the] proposed lighting fixtures."  SOQ at 3.  Subsection 6.05(E)(8)(a) allows the DRB (or this Court) to require "a lighting plan prepared by a qualified engineer or lighting expert."  Bylaws § 6.05(E)(8)(a).  Initially, Applicant had proposed to install as many as fourteen new lights on the property, including up to ten lights that would illuminate the parking area. Applicant has since scaled back her lighting plan, presumably in response to concerns expressed by area neighbors.  The site plan presented at trial included no lighting for the parking area and only four additional light fixtures added to exterior doors on the existing building.  All new fixtures will be downcast and shielded in such a way as to not expose the light source to adjoining properties.  These added lights will be turned off during non-business hours (i.e., they will be off from 7:30 p.m. to 6:30 a.m.) and will only be activated during business hours by motion sensors.  For the purpose of addressing the procedural issues raised by Appellants' Question 13,[3] we do not consider these minimal lighting impacts to be significant enough to require a lighting plan from a qualified engineer or lighting expert under Subsection 6.05(E)(8)(a).

Appellants' Question 19 also poses what we regard as a completeness-of-the-application question and not a sufficiency-of-the-evidence question.  Question 19 suggests that Applicant's presentation about the Project's traffic impact is lacking and asks whether, because of that deficiency, "a traffic impact study prepared by a traffic engineer should be presented by [Applicant] as part of the conditional review process pursuant to 6.06(D)(3) . . . ."  (SOQ at 3–4).

Section 6.06(D)(3) allows a decision-maker in conditional use review to require a traffic impact study.  Applicant and her engineer provided credible testimony and other evidence on the negligible impacts that will flow from the traffic added to this area by this Project.  The

---

[3]  We address the substantive aspects of the lighting impacts in our analysis below in Part IV.

Project consists of renovation to an existing residential building so that it may host a relatively small daycare facility that will have no independent vehicles in use. The credible testimony also revealed that some of the families that will enroll their children in this daycare may already travel on West Fairlee Road to bring their children to area schools or other daycare facilities, including Applicant's existing daycare facility in West Fairlee Village. Given the credible and detailed traffic testimony at trial and the minimal traffic impacts this Project will likely have,[4] another traffic impact study would not be necessary or helpful to this review.

We see no deficiencies in the site plans and supporting materials submitted at trial and therefore conclude, in response to Appellants' Questions 3 through 8, 13, and 19, that Applicant's plans and trial submissions satisfy the application requirements for site plan and conditional use review contained in Sections 6.05 and 6.06 of the Bylaws.

## II.    Circulation and Traffic Concerns (Appellants' Questions 9, 10, 18, and 20)

Appellants pose several questions concerning circulation, traffic, and safety. Questions 9 and 10 address Applicant's compliance with specific parking and ingress/egress requirements in the Bylaws' site plan review standards. See Bylaws § 6.05(E). Question 18 addresses traffic impact requirements in the Bylaws' conditional use review standards. See Bylaws § 6.06(D). Question 20 inquires about the safety of the Project's intersection and stopping sight distances, without citation to the Bylaws.

By their Question 9, Appellants ask whether the proposed Project will "provide[] the maximum safety of vehicular circulation between the site and the street network," as required by Bylaws § 6.05(E)(1). SOQ at 2. This Bylaw requires that vehicle access to roads and intersections involved with a development "meet all applicable town and state design standards." It also provides that the "public highway accessed from the parking lot must have sufficient excess capacity both at access and egress points and at affected intersections to accommodate the added traffic without undue delay," and empowers the permit reviewer to "limit the number and size of curb cuts to a single access" or "require the reduction, consolidation or elimination of curb cuts." Bylaws § 6.05(E)(1). This question therefore

---

[4] We address the substantive aspects of the Project's potential traffic impacts below in Part II.

contains three sub-components (applicable design standards, capacity of the roadways, and curb cuts), which the Court will address in order.

With regard to the Project's compliance with applicable state and town standards, the Town has enacted Road and Bridge Standards, a copy of which was admitted at trial as Appellants' Exhibit 7. These Standards contain a provision that imposes a duty on the Town to "have a process in place, formal or informal, to review all drive accesses . . . where they intersect Town roads . . . ." Id. Trial testimony revealed that the Town does have such a process in place, and the duty to review "drive accesses . . . where they intersect Town roads" is bestowed upon the Public Works Director. Additionally, this provision of the Road and Bridge Standards references the VTrans B-71 Standards for Residential and Commercial Drives. (Appellants' Ex. 7 at 2). A copy of the VTrans B-71 Standards was admitted at trial as Appellants' Exhibit 5.

Assuming that these provisions of the Town's Road and Bridge Standards require an applicant to conform to the Town's review process for "drive access" and the VTrans B-71 Standards,[5] we find that the Project conforms to those standards. First, the Town of Thetford Director of Public Works reviewed and approved the proposed driveway improvements, which is all that is required under the Town's review process. The Public Works Director provided credible testimony at trial concerning the Project's proposed drive access and we adopt his findings and conclusions. Second, the Court finds, based on the credible testimony of both Applicant's engineer and the Town Public Works Director, that the proposed driveway conforms to all width, horizontal, vertical, and geometric characteristics recommended by the B-71 Standards.

---

[5] This assumption is doubtful. Much trial time was devoted to an analysis of town and state highway standards, including the Town Road and Bridge Standards. But, we note that the plain language of those Standards applies only "to the construction, repair, and maintenance of all town roads and bridges." This Project does not involve any creation or revisions to town roads or bridges, and we therefore question why those Standards are applicable to this Project. Furthermore, the provision requiring drive access review and conformance with the VTrans B-71 Standard appears, on its face, only to impose a duty on the Town to develop such a review process. More still, the B-71 Standards appear on their face to be merely aspirational, and, in any event, arguably applicable only to new (not merely modified) driveways and their intersection with highways under the jurisdiction of VTrans. We nonetheless review this Project for conformance with these Standards, where applicable, since we ultimately conclude that the Project conforms to all mandatory standards.

17

The B-71 Standards also make recommendations for minimum stopping and intersection sight distances. Stopping and intersection sight distances are two different measurements relied on by traffic officials and experts. Stopping sight distance ("SSD") is a recommended minimum distance for a driver traveling on a roadway to be able to safely stop without hitting an object in a in the roadway, when travelling a certain speed. Given that the posted speed limit on West Fairlee Road is 35 miles per hour, the minimum recommended SSD for vehicles on West Fairlee Road is 250 feet under the B-71 Standards. (Appellants' Ex. 5 at 1). The sight distance on West Fairlee Road for vehicles traveling on the roadway to the proposed driveway is 312 feet from the east and 353 feet from the west. We therefore conclude that there is more than sufficient SSD for approaching vehicles.

The intersection sight distance ("ISD") measurements are a bit more flexible. The ISD is the distance a vehicle at an intersection needs to be able to see in either direction to be able to comfortably pull out of the intersection and into the roadway, given a certain speed of oncoming traffic. ISD guidelines recommend farther sight distances, by the necessity of what they are measuring. But the B-71 Standards make clear that the ISD recommendations are not as absolute as the SSD standards, since the B-71 Standards note that "[i]ntersection sight distances, equal to or greater than those shown [in the Sight Distance Chart below Note 10] should be provided in both directions for all drives entering on public [i.e., state] highways, unless otherwise approved by the Agency of Transportation." (Appellants' Ex. 5 at 1) (emphasis added). Furthermore, the B-71 ISD guidelines appear, by their terms, only to apply to commercial and residential drive intersections that are under the jurisdiction of VTrans (i.e., state and not town highways). Regardless, we have reviewed this proposed project for conformance with the applicable B-71 Standards and conclude that the project meets or exceeds those standards.

The sight distances from the proposed driveway along West Fairlee Road are 312 feet to the east and 353 feet to the west. The ISD for a speed limit of 35 miles per hour is 390 feet. Nonetheless, due to the low traffic volumes of this rural town highway, the very modest vehicle trips that this Project will add to West Fairlee Road, and the non-mandatory nature of the B-71 Standards, especially for a non-state highway, we conclude that the sight distances (both SSD

18

and ISD) for this proposed Project are sufficient. We note that the B-71 Standards require that advance warning signs be placed near intersections if sight distances at the intersection are below minimum stopping sight distances. Id. at 1, Notes below Sight Distance Chart. Since the recommended SSD is satisfied, we do not impose a condition requiring advance warning signs.

For all these reasons, we conclude that the vehicular access and intersections with roads for this Project meet all applicable town and state design standards. In so concluding, we also answer Applicant's Question 20, which asks "[w]hether the sight distances associated with the Project driveway are sufficient to provide safe stopping distances for oncoming vehicles and vehicles entering and exiting the Project site." SOQ at 4. Because of the manner in which the Question is worded, it appears that Appellants have conflated the SSD and ISD recommendations. No matter, since our conclusions for each recommended sight distance measurement, for the reasons discussed above, is identical: the Project will provide sufficient stopping and intersection sight distances, based on the recommended standards established by VTrans. We therefore answer Appellants' Question 20 in the affirmative.

With regard to the second major requirement in Section 6.05(E)(1) of the Bylaw—that access to public roads from the development not cause "undue delay"—several characteristics of this development impact our analysis. First, there are no internal roadways in this proposed development such as one might find in a subdivision or large development. This is a small development which has only one driveway and one parking area; these are the only Project components that may impact circulation and traffic. There will be no call for visitors to back into West Fairlee Road in order to exit the Property, since the parking area provides ample room for turning. There was no suggestion at trial that the daycare traffic into or out of the site will cause any further congestion or traffic disruptions. In this regard, Applicant has designed her Project for safe circulation of vehicles entering and departing from her Property. Furthermore, there has been no credible suggestion that the volume of new traffic that this Project could generate is of such a magnitude as to cause "undue delay" at area intersections or on area roadways. In fact, no intersections will be materially impacted by this Project. We therefore conclude that the project will not cause undue delay at area intersections.

19

Finally, with regard to the curb-cut provisions in Section 6.05(E)(1), Applicant has voluntarily eliminated the existing "curb cut" (i.e., access point) from the Property to Field Point Road. Thus, the only curb cut that remains at the Property is the driveway leading to West Fairlee Road. To increase the ease by which visitors will turn into and out of the Project driveway, Applicant has agreed to widen the paved portion of the driveway throat onto West Fairlee Road. This is sufficient to ensure safe access to public roads.

As a consequence of these Project characteristics, we conclude that the Project as proposed maintains and improves the safety of vehicular circulation between the site and the street network. In fact, Applicant's efforts maximize the vehicular safety and circulation. We therefore conclude that Applicant satisfies the requirements of Section 6.05(E)(1) of the Bylaws, and therefore resolve Question 9 in Applicant's favor.

Appellants' Question 10 asks "[w]hether the Project as proposed provides sufficient and adequate internal circulation, parking, and loading facilities pursuant to Section 6.05(E)(2) and specifically meets the sub-criteria contained in Section 6.05(E)(2)(a)–(e)." SOQ at 2. Section 6.05(E)(2) of the Bylaws requires (a) parking to be located on the rear or interior side of buildings; (b) connection to (or provision for future connection to) parking facilities of adjacent properties; (c) adequate ADA-compliant parking; (d) clearances and turning radii sufficient to accommodate service vehicles; (e) loading areas sufficient to meet anticipated demand.

The proposed parking area is located on the side of the lot, not fronting on a public road, and therefore satisfies Section 6.05(E)(2)(a). Given that no adjacent properties have parking areas, we conclude that the Bylaw requirement that there be provisions for future connection to adjacent parking areas does not apply here. The proposed project provides for an ADA-compliant space and has adequate turning radii, thereby satisfying 6.05(E)(2)(c) and (d). Deliveries to the Project will be minimal and can be adequately accommodated by the driveway and parking area. For all these reasons, we conclude that the Project conforms with Bylaw Section 6.05 and in particular Subsections (E)(2)(a)–(e).

Appellants' Question 18 asks "[w]hether the project as proposed will result in the creation of unsafe conditions for pedestrians, bicyclists, or motorists or unacceptable levels of service for roads adjacent to and in the vicinity of the Project pursuant to Section 6.06(D)(3)."

SOQ at 3. That Bylaw provision directs that we grant conditional use approval "only upon a finding that the proposed development will not result in an undue adverse effect on" five general standards. Bylaw § 6.06(D). General standard (3) is titled "Traffic on roads and highways in the vicinity" and prohibits approval of:

[A] project that would result in the creation of unsafe conditions for pedestrians, bicyclists, or motorists, or unacceptable levels of service for roads, highways and intersections, unless such conditions or levels of service (LOS) can be mitigated by the applicant through physical improvements to the road network and/or traffic management strategies, or improvements in public transportation.

The traffic that this Project is expected to add to West Fairlee Road and nearby intersections is slight, both in absolute numbers and as a percentage of existing traffic. The Project will likely only add traffic to this area in the early morning, when families deliver their children to the daycare facility, and again in the late afternoon, when families return to pick up their children. In both instances, it is unlikely there will be more than thirty vehicle trips (round trips, so families can deliver their children, then return to work or home) added, together with the several vehicle trips added by staff. Unlike many other Projects that we are called upon to review, this Project will generate minimal intervening vehicle trips, since the children will remain at the daycare facility throughout the day. In fact, the only intervening traffic will be the occasional vendor delivering supplies to the facility, as well as the several employees who will exchange shifts each the day.

We also note that many of the families that are likely to enroll their children in Applicant's proposed facility are likely already travelling on West Fairlee Road, either to deliver children to area schools or to other existing daycare facilities, including the one currently operated by Appellant. Thus, the net new vehicle trips created by the proposed facility will be even less than the thirty round trips mentioned above. This low level of added traffic is highly unlikely to degrade the level of service of surrounding roads. Furthermore, since the Project entails minimal added traffic and, as discussed above, provides for safe access to West Fairlee Road, the Court concludes that it will not pose a danger to pedestrians, cyclists, or motorists.

Based upon the above, we conclude that the proposed Project will not have an unacceptable impact on the traffic, roads and intersections in the vicinity or pose a danger to

area pedestrians, cyclists, and motorists. We therefore conclude that Applicant's proposed Project conforms to Bylaws § 6.06(D)(3).

**III.      Intensity of Use and Screening (Appellants' Question 11)**

By their Question 11, Appellants ask "[w]hether the land use proposed by the project results in a more intensive land use than currently exists on abutting properties and, if the answer is in the affirmative, whether the Project has provided sufficient screening to protect adverse impacts on adjacent properties pursuant to the requirements contained in Section 6.05(E)(4)." SOQ at 2.

Section 6.05(E)(4) of the Bylaws provides, "Screening shall be required where a more intensive land use is proposed to abut a less intensive use." Where required, "[s]creening shall provide a year-round visual screen, particularly from roads. A diversity of materials to create a naturalized screen is encouraged so long as sufficient screening is obtained." Id.

Applicant has proposed a small daycare facility that serves the purposes recommended in the purpose provisions concerning the VR District in both the Bylaws and the Town Plan. The Town VR District's purpose is:

> [T]o comprise relatively dense areas of settlement with the following characteristics:
>
> • Networks of streets and utilities that make efficient use of land;
>
> • Neighborhoods with resources such as schools, shops and libraries within walking distance of residences;
>
> • Relatively dense housing, noting that villages' lots "grandfathered" before zoning were often smaller than the current minimum of 20,000 square feet;
>
> • Mixed-use development, compatible in scale and lot coverage with existing development, supporting commercial and public services for residents.

Bylaws § 2.01(A). The Town of Thetford Town Plan, received in evidence as Appellants' Exhibit 13, recites the Legislative directive to ensure "the availability of safe and affordable child care" in Vermont communities and notes that it strives to "support[] the private development of additional facilities to meet the child care needs of its residents . . . ."

22

In light of the scale and nature of this Project, including that it principally involves rehabilitation of an already existing building, the Court finds it difficult to label this development as "intensive." We also note that there are other uses in the area that are as or much more "intensive," including home-based businesses, contractor's yards, children's camps on the nearby Lake Fairlee, and the Post Mills Airport. Nevertheless, Applicant concedes that her proposed project is relatively more intensive than the uses at the abutting properties.

Applicant has agreed to take multiple steps to screen the parking area, play group area, and the additional lighting for the benefit of all nearby properties. The stockade fence that Applicant plans in front will allow the Property to maintain its look as a single-family residence; Appellant will not make any exterior changes to the building, will add landscaping and planting on either side of the Property, and will encircle the rear portion of the play group area with metal and fabric fencing. All these measures will increase the screening of this Project from adjoining homes. The resulting development plans will allow a use to be developed in this neighborhood that is encouraged by the purpose provisions for both this zoning district and the applicable provisions of the Town Plan. Given that Applicant has proposed ample screening measures, we conclude that Applicant conforms with Bylaws Section 6.05(E)(4).

## IV. Lighting Concerns (Appellants' Questions 12 and 14)

By both their Questions 12 and 14, Appellants challenge whether the Project's proposed lighting conforms to the applicable site plan review provisions for lighting. See Bylaws § 6.05(E)(8). These provisions, in pertinent part, require that lighting be in recessed, shielded, or cutoff fixtures so that light is emitted no fewer than fifteen degrees below horizontal; that parking lot lighting conform to the Outdoor Lighting Manual for Vermont Municipalities unless application of this manual would be "inappropriate or unduly burdensome"; and that outdoor fixtures only be illuminated during hours of operation. Bylaws § 6.05(E)(8)(a), (d), (h). The Bylaw also includes aspirational language regarding motion sensors, timers, and dimmers to reduce energy consumption. Id. § 6.05(E)(8)(e).

As noted above, it appears that Appellants' fears are based on a lighting plan that Applicant no longer proposes. Applicant presented at trial a lighting plan that is now very limited, and that is the only lighting plan that this Court will consider or approve at this time.

23

Applicant's lighting plan consists of minimal additions: four building-mounted lights, all downcast, which will be turned off during non-business hours and will only be turned on during business hours when activated by motion sensors. Presumably in response to some neighbors' concerns, Applicant has eliminated her planned lighting for the parking area. The lights that currently exist on the building are similar to the lighting used on area homes, and will be shielded as required under Subsection (d). Because of these minimal lighting impacts, we conclude it would be unduly burdensome to require the application to conform to the Outdoor Lighting Manual for Vermont Municipalities. For all these reasons, we conclude that Applicant's lighting plans conform to Bylaws Section 6.05(E)(8).

## V.      Conformance with Applicable Noise Standards (Appellants' Question 15)

By their Question 15, Appellants ask "[w]hether the project as proposed meets the noise standards contained in Section 6.05(E)(9)." SOQ at 3. This legal issue was one of the more hotly contested of the trial, whereby there was much discussion of the manner in which noise in measured, the level of background noises, the estimated noise level that will be created once the proposed daycare center is fully operational, and what impact Applicant's proposed screening will have on the Project noises, when measured from off site.

Section 6.05(E)(9) establishes a fairly straightforward limitation on the noises that a new Project may emit. It directs that in the VR District "noise shall not exceed 60 dBA at or beyond the boundaries of the property from which it originates from 7:30 AM to 7:30 PM or 50 dBA from 7:30 PM to 7:30 AM." Bylaws § 6.05(E)(9)(a).

Applicant and her engineer provided credible testimony, essentially uncontradicted, that noises already exist in this area that exceed these maximums, sometimes in a factor of twice or more these maximums.[6] However, even in light of this uncontested reality, we cannot

---

[6] Applicant's engineer offered credible and unrefuted testimony that already existing noises in the area often exceed 70 dBA and have been recorded on a regular recurring basis as high as 79 dBA. We understand that, because dBA is a logarithmic unit, noises that are measured at 10 dBA louder than the original noise are twice as loud as the original noise. See In re Lathrop Ltd. P'ship, Nos. 122-7-04 Vtec, 210-9-08 Vtec, and 136-8-10 Vtec, slip op. at 34 (Vt. Super. Ct. Envtl. Div. Oct. 18, 2013) (Durkin, J.), aff'd in part and rev'd in part, 2015 VT 49. Some of the area uses that often exceed the Bylaw noise limitations are airplanes from the nearby airport, the loudspeakers and other activities and the children's camps on Lake Fairlee, neighborhood dogs, wildlife, construction yards and vehicles, and buses and trucks that use West Fairlee Road.

avoid our responsibility to determine whether the proposed Project conforms to all applicable Bylaw provisions. We know of no Bylaw provision that allows us to ignore the noises that may be created by this Project simply because louder noises already exist in the neighborhood, and we cannot create such a provision out of thin air. Thus, we focus on determining what level of noise will be caused at or beyond the Property boundaries once the proposed daycare center is fully operational.

Applicant's engineer provided credible testimony concerning the estimated noise levels likely to be emitted at the proposed daycare. His noise-related testimony was especially credible for several reasons, including his experience and expertise in measuring and evaluating noise levels and the fact that his estimated noise levels were based, in part, on actual readings he derived from visiting Applicant's current daycare center while it was in full operation and while children were playing in the outside playgroup yard. Appellant's expert concluded that noise at the proposed daycare center will be the loudest when the children are outside in the playgroup area, and that those noises, at their loudest, will measure 71 dBA when measured thirty feet from the center of the play group.[7] Applicant's expert further credibly explained that, at any boundary beyond 107 feet from the center of the playgroup, the noises are unlikely to exceed 60 dBA. This estimate does not take into account intervening barriers (e.g., stockade and fabric-covered fences, landscaping, building, and trees).

These credible facts still leave us uncertain as to what the noise levels will actually be once this day care center is in full operation. This uncertainty is not unusual in land use litigation, since the subject of land use litigation is often a prediction of what is likely to occur in the future, not what has happen in the past. Luckily, we are authorized to address such uncertainties by imposing conditions on our approval, as allowed under the conditional use provisions of the Bylaws.

By establishing boundaries for a designated play area that are at least 107 feet from the nearest property boundary line, Applicant could ensure beyond a doubt that the noise levels

---

[7] We adopt this estimate as our determination of the estimated loudest noises to be caused by the proposed Project. In fact, little credible evidence was offered by Appellants' expert that specifically contradicted this determination. To the extent that Appellants offered conflicting suggestions of the estimated noise levels, we found it not credible and reject it.

realized at the boundary lines will not exceed 60 dBA.  Though Applicant's proposed rear fenced-in yard area is large enough to accommodate this restriction,  we are skeptical that this much distance is even needed, given the unaccounted-for acoustic screening from structures and plantings between the playgroup area and nearest boundary lines, which will likely bring the noise level below 60 dBA at 107 feet.  Therefore, we will impose the following condition on our approval of Applicant's operation: Applicant shall constrain the play group area in the rear yard to whatever extent is necessary to limit the noise levels at or beyond her Property boundaries to no more than 60 dBA from the hours of 7:30 a.m. to 7:30 p.m. and no more than 50 dBA from the hours of 7:30 p.m. to 7:30 a.m.  To the extent that the operation of this facility causes louder noises, Applicant and her successors and assigns must restrict the operational limits of the play group area to at least 107 feet from the property lines, or be at risk of violating the terms of this permit condition.  By this condition, we also direct that no other noises caused by the operation of the proposed facility shall exceed these restrictions as well.

We note that Appellants offered concerns at trial about the infrequent noises that may occur at or just outside of the Property, such as noises from passing vehicles and car doors being opened, closed, and locked.  We received no credible evidence of the level of noise these infrequent activities will cause and therefore cannot conclude that such activities will cause noises in excess of 50 or 60 dBA to be recorded at or beyond the property lines.  In this instance, we note that the immediate area surrounding the Property does not exist in isolation; that it is part of a broader community that has benefits and activities that cause similar noises to be realized at the neighbors' respective properties.

**VI.      Undue Adverse Effect on Character of the Area (Appellants' Questions 16 and 17)**

We now address the last set of challenges to Applicant's proposed Project.  Appellants' Questions 16 and 17, both by specific and implied references, rely on the directives contained in the conditional use general standards announced in the Bylaws.  Section 6.06(D)(2) provides that conditional use approval may only be granted if the proposed development will not have an undue adverse effect on "[t]he character of the area affected as defined by the purpose or purposes of the zoning district within which the project is located," taking into account

26

[T]he location, scale, size, mass, materials, type, density, and intensity of use associated with the proposed development in relation to the character of the area likely to be affected, as defined by the purpose or purposes of the zoning district within which the project is located, and specifically stated policies and standards of the Thetford Town Plan.

Before we begin our analysis, we note two important points. First, Appellants argued at trial that the relevant "area" to be considered under Subsection 6.06(D)(2) only includes the few residences immediately surrounding the Subject Property. We reject this claim. Development opponents cannot, in the course of litigation, redefine affected "areas" to include only the uses they favor, so as to exacerbate the perceived impact of the proposed development. Rather, they must consider districts as they are laid out in duly enacted town bylaws and plans. We therefore consider the affected neighborhood as the area encompassed by the particular VR District in which the Subject Property lies, and reject Appellants' assertion that the "neighborhood" should be regarded as little more than the several homes that surround the Subject Property. Furthermore, even if we were to define the affected area narrowly, the applicable Bylaw provision would still require us to analyze what impact the proposed Project may have on the character of the area "as defined by the purpose or purposes of the zoning district within which the Project is located, and specifically stated policies and standards of the Thetford Town Plan." Id. We interpret this provision to direct that we consider the impact not on what currently exists in the VR District, but rather what the community has articulated as its current and future goals for the VR District.

The Town's vision for the VR District includes a variety of uses, some of which currently exist in the District, some which do not currently exist, but which the purpose provisions encourage. See Bylaws § 2.01(A) (describing the desired uses as including "[n]eighborhoods with resources such as schools, shops and libraries within walking distance of residences"). The applicable Town Plan provisions declare that the Town "supports the private development of additional facilities to meet the child care needs of its residents . . . ."

With these provisions in mind, we conclude that the proposed Project will not cause an adverse effect (undue or otherwise) upon the character of the area, as that character is defined by the applicable Bylaw provisions for the VR District and the Town Plan's specifically stated

policies and standards.  In fact, this proposed Project will likely complement the stated purposes and standards for this District.  For all these reasons, we conclude that the Project as proposed conforms to Bylaw § 6.06(D)(2).

## Conclusion

For all the reasons stated above, we conclude that Applicant's proposed Project is entitled to positive findings of fact and conclusions of law on all issues raised in this appeal. Because of these findings and conclusions, we conclude that Applicant's proposed children's daycare facility is entitled to site plan and conditional use approvals, subject to the conditions below and subject to all findings, conclusions, and conditions imposed by the DRB that were not challenged in this appeal.

We condition our approvals upon the following:

1. Applicant shall constrain the play group area in the rear yard to whatever extent is necessary to limit the noise levels at or beyond her Property boundaries to no more than 60 dBA from the hours of 7:30 a.m. to 7:30 p.m. and no more than 50 dBA from the hours of 7:30 p.m. to 7:30 a.m.  To the extent that obstructions between the play group area and the Property boundaries, such as fencing, the building, landscaping, and plantings, diminish the noise levels at or beyond the boundaries, Applicant may allow the play group area to be maintained closer to such boundaries, but always within the fenced-in area, up until the distance where noise exceeds these maximum levels.

2. All conditions imposed by the DRB in their Decisions dated November 27, 2012 and July 2, 2013 that were not appealed or were not contradicted by the rulings of this Court shall remain in full force and effect.

These proceedings are remanded to the Town of Thetford Zoning Administrator, solely to complete the ministerial act of issuing a zoning permit that conforms to this Decision and the unappealed provisions of the prior DRB decisions.

This completes the current proceedings before this Court.  A Judgment Order accompanies this Merits Decision.

Electronically signed on November 17, 2015 at Burlington, Vermont, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Judge
Environmental Division